2024 IL App (1st) 221423-U

SIXTH DIVISION
March 8, 2024

No. 1-22-1423

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 93 CR 21689 |
| | ) | |
| BERNARD LOPEZ, | ) | The Honorable |
| | ) | Tyria Walton, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE TAILOR delivered the judgment of the court.
Justices C.A. Walker and Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*: The judgment of the trial court denying defendant's post-conviction petition at the third stage is affirmed where the evidence presented was not of such a conclusive character that it would have probably changed the result at trial.

¶ 2                                   I. BACKGROUND

¶ 3    In the early morning hours of August 22, 1993, Victor Lechuga, Rudy Garcia, and Nina Buchanan were shot near the corner of 17th Place and Halsted Street in Chicago, Illinois. Lechuga died at the scene, and Garcia and Buchanan sustained serious injuries. On September

22, 1993, Lopez was indicted for the first-degree murder of Lechuga; the attempted first-degree murder of Garcia and Buchanan; and aggravated battery with a firearm of Garcia and Buchanan.

¶ 4        Lopez's jury trial commenced on September 19, 1995. Rudy Garcia testified that on the evening of August 21, 1993, he was driving around with his little brother, Victor Lechuga; his girlfriend, Nina Buchanan; and his friend Richard Ruiz. They got some pizza, and then drove to 17th and Halsted, where Ruiz's aunt lived. After Ruiz parked the car and went into his aunt's house, Garcia saw a white car pass by. He told Victor they should leave because he thought there was going to be trouble. He explained that they lived in territory controlled by the Disciples gang but were in the territory of a rival gang called the Bishops. Garcia told Victor to move into the driver's seat and drive away, but Victor—who was 15 at the time—could not drive yet, so Garcia got into the driver's seat. As he was about to turn the car on, he saw the white car that had passed them earlier park behind him. A male came up to the driver's side window, said, "What's up All Mighty," and hit Garcia in the forehead with a bottle, which caused his head to start bleeding profusely. Garcia heard more guys coming, and they all started hitting him with bottles. Meanwhile, he could hear his brother, who was seated in the front passenger seat, struggling with guys on the other side of the car. After some men opened the door and pulled him out, Garcia was able to pull himself back in the car, lock the door, and stick his feet out the window in an effort to kick at the men to defend himself. The men kept throwing bottles. Then he heard gunshots coming from the driver's side of the car. He heard Victor say he was hit. Victor subsequently died in his arms. Garcia was shot three times in the leg and spent a week in the

hospital. When Garcia was asked if he saw the shooter, he said he remembered seeing four individuals and that one had a white shirt. He was unable to conclusively identify anyone.

¶ 5     Richard Ruiz testified next. He said he was driving around with Garcia, Victor, and Buchanan on the evening of August 21, 1993. They stopped for pizza, bought some beer, and then drove to his aunt's house to try to get some marijuana. He parked the car in front of his aunt's house, went upstairs, and talked with her. His little cousin, Marisa Martinez, then called him to the window. When he looked outside, he saw about five men standing around his vehicle. He saw them throwing bottles and saw one man stand on top of the hood and smash the front windshield in with his feet. Ruiz then ran downstairs. As he was heading down, he looked out a window near the door and saw someone shooting into his car. He explained that it was bright enough for him to see because the streetlights were on. Ruiz said the shooter was standing at the driver's side of the vehicle and fired four or five shots. He said that the shooter was "inside" or "real close" to the driver's side window of the car, and that he believed the shooter was holding the gun in his left hand. He described the shooter to police as "150-160 pounds" and said he was "[c]hunky. Had a white T-shirt. Brown cut-off shorts, pushed back hair." He subsequently identified Lopez in a lineup and said he picked him out because he "saw him at the scene." When asked what it was about Lopez that he recognized, he said, "Just his body, his face. Just him." On cross-examination, he admitted that he initially told police that there "may have been someone at the passenger side shooting at Victor" but testified on redirect that he never saw a gun in anyone's hands on the passenger side and just assumed there must have been a second shooter due to the number of shots fired.

¶ 6     Nina Buchanan's testimony was consistent with that of Garcia and Ruiz. She said that after they parked in front of Ruiz's aunt's house and a white car passed them by, Garcia got into

3

the driver's seat. When the white car parked behind them, she could see two males and two females in the vehicle. The males got out and started hurling gang insults and throwing bottles so she got down in the back passenger seat of the vehicle with her face looking down on the floor. She then heard gunshots coming from the driver's side of the vehicle and realized she had been shot in the face, legs and chest. She was unable to identify anyone as the shooter.

¶ 7 Officer Rita Kennedy testified that she responded to the scene and received information from unidentified witnesses regarding the "nicknames of the offenders that were the shooters in this case," Devious and Marcello. She admitted on redirect, however, that her police report did not say Devious and Marcello were the shooters, only that witnesses saw them at the scene. Her partner, Officer Rich Gutierrez, testified that the witnesses said they saw Devious and Marcello fleeing the scene, but did not identify Devious or Marcello as the shooter. Officers Kennedy and Gutierrez then looked in their gang file for individuals with the nicknames "Devious" and Marcello. The nickname "Devious" matched to the name John Morales. When performing a traffic stop in the early morning hours of August 22, 1993, they encountered a man who said his name was John Morales and admitted his nickname was Devious, so they arrested him and took him to the police station for questioning.

¶ 8 John Morales testified at trial. He admitted he was a member of the Bishop gang, but denied being at 17th and Halsted on the night of the shooting. He testified that he and his girlfriend, Lisa Aguirre, went out to get food around midnight and returned to his house, where they remained until some friends of Aguirre's came over around 4:00 am. He said they started driving around, and he was subsequently arrested. He made statements to police shortly after his arrest indicating that Lopez showed up at his house on the night of the shooting. However, when he was confronted with these statements at trial, Morales recanted and denied telling the police

that Lopez had come to his house around 1:30 am; that Lopez was out of breath; that Lopez said he and other Bishops had been chasing a car full of Laraza gang members; that Lopez admitted he had a handgun; and that Lopez said he fired into the car, knew he hit some of the guys in the car because he saw blood on them, and thought one of the girls saw his face as he shot at her. When Morales was presented with a written statement he had signed at the police station that included these earlier statements, he admitted signing the statement but claimed he never read it before he signed. He said he never made those statements to police and only signed it because police told him he had been identified as a shooter at the scene and in a lineup and that he was going to go down for the crime and would never see his girlfriend again unless he signed it. The written statement Morales signed at the police station was read to the jury and admitted into evidence. On redirect, Morales admitted that he and Aguirre had visited Lopez in jail a number of times. He also admitted that he and Aguirre spoke to Lopez's attorney after Lopez's girlfriend contacted him and asked him to do so.

¶ 9    Lisa Aguirre, John Morales' former girlfriend testified next. She testified that Morales was a Bishop gang member, and that Lopez was a Bishop as well. She knew Lopez because he was her former neighbor and used to live right behind her house. She spoke to police shortly after the shooting and made statements, which  implicated Lopez as the shooter. Like Morales, however, she recanted at trial, and said that the statements police claimed she made to them shortly after the incident were not true. She denied telling police that Lopez came to her house on the night of the shooting, that he looked nervous, and that Lopez talked to Morales and said he had just shot at two guys and a girl who were sitting in a car and that he knew he hit one of the guys because he saw blood on his shirt. She also denied telling police that Lopez said the girl in the car saw his face when he shot at her and that he needed to get out of town. When she was

confronted with the written statement she had given to police, Aguirre admitted signing it, but claimed that she never read it before she signed. She said she felt threatened by police who told her Morales was going to get charged with murder based on the shooting, and said the police told her if she signed, she and Morales could go home. She stated that that she and Morales were not present at the scene, and that Lopez never came to their house on the night of the shooting. Her written statement to police was read to the jury and admitted into evidence.

¶ 10    Detective Thomas McGreal testified next. He stated that he arrested Lopez after his conversations with Aguirre and Morales, in which they implicated Lopez as the shooter. After Lopez was *Mirandized*, McGreal told Lopez he had spoken to other members of Lopez's gang and that they had implicated him. Lopez admitted that he was a member of the Bishop street gang, and said that on the night of the shooting, he was in the vicinity of 17th and Halsted, working security for the gang. A car with members of an opposing gang, the LaRaza, were in the area, and he and his fellow gang members became involved in a fight with them. Lopez admitted to having a handgun, but denied using it. He said he got bricks and bottles and threw them at the occupants of the car and broke the front windshield of the car. He said that as he was punching and physically holding the driver of the car, a member of a different gang, the Gaylords, appeared, stuck a gun in the window, and shot the victims. Lopez said he stood back in shock, then ran to Devious's house to call his cousin, Julio Morales, to pick him up. The next day, McGreal spoke with Lopez a second time. In this conversation, Lopez directed police to a gun he had hidden near the scene. When Detective Bronsberg and other detectives went to the area, they

recovered a small .22 caliber handgun and a baby food jar that contained six live .357 caliber cartridges from a large wooden box.

¶ 11    Medical testimony from Dr. Robert Kirschner, Cook County's Deputy Chief Medical Examiner, established that Victor was shot three times, twice in the back and once in the right shoulder. Stippling—evidence of partially burned gun powder particles that have embedded in the skin—near the back wounds indicated that the shots were fired from a "relatively close range of firing," approximately six inches to no more than two feet from the victim. Testimony from Ernest Warner, an expert in the field of firearms identification, established that at least three of the five bullets recovered, .38 Special bullets, were fired from the same gun, and that two of the other bullets, which were recovered at the hospital, could have been fired from the same gun. He said there were "insufficient individual characteristics" to conclusively determine that the bullets recovered at the hospital came from the same gun because these characteristics could have been destroyed by penetrating a hard surface or impacting with a hard surface, or even due to handling by hospital personnel. Warner also examined the .357 Magnum live rounds of ammunition that were recovered by police detectives after Lopez informed them of the location of a handgun. He testified that the .357 Magnum bullets and the .38 Special bullets recovered from the scene of the crime could have been fired from the same gun, but stated that neither type of bullet could have been fired from the .22 caliber handgun that was recovered by police. In addition, he noted that when he examined the .22 caliber handgun that was recovered in August of 1993, it did not appear that it had been recently fired. He based his opinion on the absence of powder residue in the barrel and chamber of the weapon.

¶ 12    Ezra Ruelo testified that she knew Lopez through her ex-boyfriend, Julio Morales, who was Lopez's cousin. She stated that on the evening of August 21, 1993, and into the morning

hours of August 22, 1993, she was driving around with Julio, Marcello Ramirez and Monica Melicio. She was sitting in the front passenger seat, Julio was driving, and Marcello and Melicio were in the back. When they drove by 17th and Halsted, they saw a car parked in the alley. Marcello told Julio to turn back around "because there is Laraza[,]" which Ruelo understood to mean a gang, so they went back and parked behind the car. Ruelo saw three people seated in the car in front of them. Julio and Marcello got out of the car and "started fighting" and throwing bottles at the guys. She then heard a bunch of people, approximately 10-15, coming from behind her. She testified that she then heard a gunshot so she ducked down. Afterwards, Julio and Marcello got in the car and reversed out. She clarified that she heard multiple shots but denied seeing the shooter or seeing Lopez at the scene that night. Afterwards, she was confronted with a signed statement she had previously given to prosecutors and their investigator at her home. In it, she stated that after driving down 17th Place and seeing the car there, she, Julio, Marcello, and Melicio went to 18th and Union to Pauly's bar. She said that Julio and Marcello told Lopez and other Bishops there were Larazas at 17th and Halsted, that the whole group, including Lopez, then started running toward 17th Place, and that Bishops all came around and started throwing rocks and bottles and yelling "All mighty Bishop." She said she then saw Lopez with a gun at the driver's side of that car, that she saw him point the gun inside the window, and that after she ducked down, she heard three to four shots. At trial, Ruelo denied making those statements to prosecutors, testified that she never read the statement before signing, and said she signed it because she felt threatened and wanted the prosecutors to leave. Evidence established that Ruelo had visited Lopez 15 times after he was incarcerated. However, Ruelo denied speaking with him during these visits, and said she just went along with Lopez's girlfriend, Sharon. Ruelo's written

8

statement, in which she implicated Lopez as the shooter, was read to the jury and admitted into evidence.

¶ 13    On November 6, 1995, Lopez was convicted of first degree murder of Victor Lechuga, of attempted first degree murder of Nina Buchanan and Rudy Garcia, and of aggravated battery with a firearm of Buchanan and Garcia. He was sentenced to 60 years on the first degree murder count and 15 years on the attempt counts, to run consecutive.

¶ 14    Lopez appealed his conviction and sentence, arguing that (1) there was no probable cause to arrest; (2) the State did not prove him guilty beyond a reasonable doubt; and (3) his 75-year sentence was excessive. This Court rejected his claims and affirmed his convictions and sentence *People v. Lopez*, 1-95-4165 (1999) (unpublished order under Ill. Sup. Ct. R. 23), and a subsequent petition for leave to appeal was denied. *People v. Lopez*, 185 Ill. 2d 650 (1999).

¶ 15    In April 2000, Lopez filed an initial *pro se* postconviction petition alleging that he was actually innocent. He attached the affidavit of a man named Richard Cornelio, who claimed he was actually the shooter. This petition is discussed by the parties in their briefs, but it is not part of the record on appeal. After second stage proceedings, the State filed a motion to dismiss, arguing that Lopez's petition was untimely. In June of 2004, the trial court granted the State's motion to dismiss. Because the parties had only argued the timeliness issue, the trial court did not specifically address Lopez's other claims. Lopez appealed, and this Court affirmed the dismissal. *People v. Lopez,* 1-04-1772 (2006) (unpublished order under Ill. Sup. Ct. R. 23).

¶ 16    In November of 2018, Lopez filed a *pro se* motion for leave to file a successive post-conviction petition. On August 16, 2019, with the assistance of counsel, Lopez sought leave to file a superseding successive petition alleging "actual innocence" based on newly discovered evidence, which included an additional eyewitness. In July of 2020, the State filed a motion to

9

dismiss. In response, Lopez requested a third stage evidentiary hearing to present the testimony of Denise Collins. He attached a copy of an affidavit from Collins, dated August 17, 2018, to his filing. In this affidavit, Collins swore that in 1993, she lived on 17th Street in Chicago and knew Lopez and Cornelio from the neighborhood. "One night" in August of 1993, she left her house to buy marijuana from "Irene." As she crossed the street, she saw Cornelio shooting into the driver's side of a car parked "a few feet away." She said "[t]here were three other guys" with Cornelio but said she was "positive" none of the three was Lopez because she was "able to see their faces." She never told anyone because she was afraid of Cornelio, and she eventually moved out of state. In 2017, she learned that Lopez had been convicted of the murder and so she decided to come forward with her information. She also came forward because she knew Cornelio was dead.

¶ 17    The matter proceeded to a third stage evidentiary hearing before Judge William Raines. Lopez presented the testimony of Denise Collins and also offered several items into evidence: four scene photographs; a transcript from Collins's interview with Lopez's attorney, which occurred on December 5, 2019; and Collins's signed affidavit, dated August 17, 2018.  Collins testified that on August 22, 1993, she was 20 years old and lived at 712 West 17th Street in Chicago with her grandmother. She knew Cornelio, who was also known by the nickname "Little Man," from the neighborhood. She also knew Lopez because they attended the same grammar school, although they were never friends. In the evening hours of August 21st into the morning hours of the 22nd, she left her home to buy marijuana from a woman named "Nena" who lived about a block away. As she was walking across 17th Place toward Nena's house, she saw Cornelio about two car lengths away. Cornelio was standing at the driver's side window of a black, four door, older model Cadillac that was double parked in the street and he was shooting a

gun into the window. She heard one shot, made "eye contact" with Cornelio and ran home. She testified that she did not see Lopez and did not tell anyone what she saw because she was scared. Shortly after the shooting, she moved to the Bridgeport area. She then moved to Berwyn, Illinois, then to Indiana, and then to Texas. In 2017, she moved back to Chicago and learned from her sister that Lopez had been convicted of murder. Her sister was friends with Lopez's girlfriend Martha, and Martha put Collins in touch with Investigator Mort Smith. Smith told Collins he was trying to help Lopez and Collins understood that to mean that he was "working with" Lopez. Smith asked her questions about the night of August 21st and the early morning hours of August 22, 1993. Smith took notes while she talked, then mailed her a typed affidavit to sign. She did not remember when she signed the affidavit and did not remember signing it in front of a notary, but she acknowledged that the affidavit she was shown in court contained her signature. Collins admitted that in all the years that had passed since 1993, she never told anyone that Cornelio was the shooter. Collins also met with Lopez's counsel at a later date and gave a statement. The statement was mailed to her, she reviewed it and stated that it contained all the information that she knew about the shooting.

¶ 18     On cross-examination, Collins stated that Cornelio was the only person outside by the car on the night of shooting and said there was "nobody on foot [and] nobody in the street." There were no "onlookers," just her and Cornelio. On redirect, defense counsel asked Collins to review her affidavit, in which she swore that when she saw Cornelio shooting into the car, "[t]here were three guys with Little Man. Neither of the other three guys was [Lopez]. I am positive it was Little Man shooting and I am positive none of the three guys was [Lopez] because I was able to see their faces." When defense counsel asked her if that statement was accurate, Collins responded, "Yeah, there was nobody in the street. There was a car parked in back of the car that

was there, and you could just see their silhouette, but you couldn't see their face or anything else***."

¶ 19    After Collins's testimony, the parties agreed to a continuance for the defense to arrange for the testimony of Smith. Shortly thereafter, Judge Raines was replaced by Judge Tyria Walton. Judge Walton explained that a new third stage evidentiary hearing was necessary in order for her to have the opportunity to judge the credibility of the witnesses on her own so she would not have to rely solely on the transcript from the hearing before Judge Raines. The new hearing began on August 5, 2022.

¶ 20    At this hearing, Lopez presented testimony from Collins a second time and entered the following into evidence: five scene photographs; Collins's signed affidavit, dated August 17, 2018; and the transcript from the December 2019 interview with Collins that was conducted at defense counsel's office. The State offered the appellate record, including trial transcripts and the transcript of the first hearing held in November before Judge Raines. At the hearing before Judge Walton, Collins testified that in August of 1993, she was 20 years old and lived in the area of Halsted and 17th Street in Chicago. Collins was not friends with Lopez, but they attended the same grade school, and she knew some of his family. She knew Cornelio from seeing him around the neighborhood. In the late evening hours of August 21st into the morning hours of August 22nd, she left her home to buy marijuana from "Nena" who lived a block away on 17th Place. As she crossed the middle of 17th Place, she saw Cornelio, also known as "Little Man," standing in the street on 17th Place shooting into the driver's side of a car that was double parked in front of Nena's house. Cornelio shot "two to three" times. Another car was parked behind the car that she saw Cornelio shooting into. There were no other people in the street or near the car and she never saw Lopez that night. She did not tell anyone about the shooting because she was

afraid. Shortly after the shooting, she moved to Berwyn, and later moved to Indiana and then to Texas. In October of 2017, she moved back to Chicago. It was then that she learned from her sister that Lopez was "incarcerated for the murder" and she felt guilty because she knew Lopez "didn't do that." In August of 2018, she met with Smith and told him what she saw the night of August 21st into the morning of August 22, 1993. She signed an affidavit containing her statement.

¶ 21    The trial court denied Lopez's successive postconviction petition. The trial court stated that to establish a claim of actual innocence, the evidence must be: (1) newly discovered; (2) not discoverable through the exercise of due diligence; (3) material and not merely cumulative; and (4) of such a conclusive character that it would probably change the results on retrial. The court determined that Lopez satisfied the first two elements because Collins's testimony was not available or known to Lopez at the time of the original trial. However, the court found that the evidence presented was not material and merely cumulative. The court referenced Lopez's initial post-conviction proceeding, which included a claim of actual innocence based on the affidavit of Cornelio, and determined that, when viewing all of the evidence that would be presented on retrial, Collins's testimony was the same "story" that was told by Cornelio, and therefore, the evidence was not material but was merely cumulative. Addressing the fourth element, the court said it had to "weigh the credibility" of Collins to determine if the evidence was of such a conclusive character that it would probably change the results on retrial. It noted that Collins was the only witness presented and said corroborating evidence would have been helpful due to varying versions of her testimony. It found that inconsistencies in Collins's testimony at the two hearings and her affidavit "raise[d] great concern about Collins's credibility." The court noted that at the instant hearing, Collins stated that "there w[ere] no other individuals outside, just the

shooter, Mr. Cornelio" but in her affidavit, she stated that "[t]here were three guys with Little Man." In her affidavit, she also said she could tell "none of the three guys was [Lopez] because I was able to see their faces," but when defense counsel asked her if that statement was accurate, Collins responded, "Yeah, there was nobody in the street. There was a car parked in back of the car that was there, and you could just see their silhouette, but you couldn't see their face or anything else." The court also noted the inconsistencies between Collins's testimony about the number of shots she heard. Ultimately, the court concluded that Lopez failed to demonstrate actual innocence and denied his successive postconviction petition because it did not "believe that [Collins's] testimony was of such a conclusive nature that it would change the results if retried." Lopez now appeals, arguing that the trial court should have remanded his case for a new trial.

¶ 22                                    II. ANALYSIS

¶ 23    The Post-Conviction Hearing Act (the "Act"), 725 ILCS 5/122-1, *et seq*. (West 2022), allows a defendant to challenge his conviction or sentence by showing that, in the proceedings which resulted in his conviction, he suffered a substantial denial of his federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). Although the Act contemplates only one post-conviction proceeding, *People v. Robinson,* 2020 IL 123849, ¶ 42, this rule can be relaxed if the defendant can establish (1) "cause and prejudice" for failure to raise a claim in an earlier proceeding or (2) a claim of actual innocence. *Id.*

¶ 24    To establish actual innocence, the petitioner bears the burden of presenting evidence that was: (1) newly discovered, (2) material and not cumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47; see also *People v. Coleman,* 2013 IL 113307, ¶ 96; *People v. Edwards*, 2012 IL 111711, ¶ 32.

14

¶ 25    First, the court must determine whether the evidence is new, material and noncumulative. *Coleman,* 2013 IL 113307, ¶ 97. If it is, "the trial court must then consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* "This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make." *Id.*

¶ 26    In this case, the petition advanced to the third-stage evidentiary hearing. See 725 ILCS 5/122-6 (West 2022). At the third-stage evidentiary hearing, defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton,* 223 Ill. 2d at 473.  The court may consider affidavits, depositions, testimony, or other evidence to weigh the merits of the petition and determine whether the defendant is entitled to relief. *Id.* Following an evidentiary hearing where fact finding and credibility determinations are involved, the trial court's decision will not be reversed unless it is manifestly erroneous. *People v. Ortiz,* 235 Ill. 2d 319, 333 (2009). "Manifest error" is defined as "error which is clearly evident, plain, and indisputable." *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) (internal quotations and citations omitted).  Under this standard, "we must give great deference to the trial court's factual findings following an evidentiary hearing because the trial court stands in the best position to weigh the credibility of the witnesses." *People v. Hotwagner,* 2015 IL App (5th) 130525, ¶ 31.

¶ 27    The trial court concluded that the evidence presented by Lopez was newly discovered and not discoverable through the exercise of due diligence, so Lopez challenges only the trial court's findings that 1) the evidence was not material and merely cumulative and 2) the evidence was not of such conclusive character that it would probably lead to a different result on retrial. We address each element in turn.

¶ 28                    A. The Evidence Was Material and Not Cumulative

¶ 29    Evidence is material if it is "relevant and probative of the petitioner's innocence." *People v. Robinson,* 2020 IL 123849, ¶ 47. Here, there is no question that Collins's testimony – in which she implicated Robert Cornelio and excluded Lopez as the shooter – is relevant and probative of Lopez's innocence. The question therefore is whether the evidence presented was cumulative. "Evidence is considered cumulative when it adds nothing to what was already before the jury." *People v. Ortiz,* 235 Ill. 2d at 335.

¶ 30    Here, the trial court concluded that Collins's testimony, in which she asserted that Cornelio was the shooter, was cumulative because "it is the same story" that Lopez had argued in his first postconviction petition, "just a different person telling the story." However, the trial court was required to consider Collins's testimony in relation to the evidence presented at Lopez's 1995 trial, not the evidence submitted in a prior postconviction petition. Had the trial court performed the proper analysis here, it would have concluded that Collins's testimony was not cumulative, because the jury heard no mention of Cornelio at trial, or any suggestion that he was in fact the shooter. See *People v. Woods,* 2020 IL App (1st) 163031, ¶ 51 ("Evidence is not cumulative if it adds to the information that was before the jury and raises additional questions concerning the jury's verdict."); *People v. Ortiz,* 235 Ill. 2d 319, 335-36 (2009) (the trial court's finding that a new eyewitness's testimony was cumulative of other evidence was manifestly erroneous because "[n]o other defense witness at trial offered the evidence presented by [the new eyewitness]" and the new eyewitness's testimony "supplied a first-person account of the incident that directly contradicted the prior statements of the two eyewitnesses for the prosecution" and "added to what was before the fact finder"). Therefore, we conclude that the trial court erred when it determined that the new evidence was not material and merely cumulative.

¶ 31                B. The Evidence was Not of Such Conclusive Character
                    That It Would Probably Lead to a Different Result on Retrial

16

¶ 32     Even though the trial court erred when it found that Collins's testimony was cumulative, "errors in the trial court's assessment of the evidence or conclusions of law do not require reversal if the judgment is correct." *People v. Lee,* 344 Ill. App. 3d 851, 852 (2003). After reviewing the record, we must determine whether the trial court's ultimate conclusion—that a new trial was not warranted based on the newly discovered evidence—was manifestly erroneous. *Coleman,* 2013 IL 113307, ¶ 98. As stated above, a decision is manifestly erroneous only "when the opposite conclusion is clearly evident." *Id.*

¶ 33     Lopez argues that Collins's eyewitness testimony was of such conclusive character that it would probably lead to a different result at trial. Again, to satisfy this test, new evidence must "place[] the trial evidence in a different light and undermine[] the court's confidence in the judgment of guilt." *Robinson,* 2020 IL 123849, ¶ 56. "Probability, not certainty, is key in determining whether the fact finder would reach a different result after considering the trial evidence along with the new evidence." *Id.* ¶ 57. It is the circuit court that "in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 2013 IL 113307, ¶ 97.

¶ 34     In this case, the trial court based its decision to deny Lopez's successive postconviction petition, in large part, on its credibility determination of Denise Collins, Lopez's new eyewitness. It found that discrepancies in her testimony regarding the number of shots she heard, as well as whether there were other people with Cornelio on the night of the shooting, whether those individuals were outside or inside a car, and whether she could see their faces or not caused "some concerns [to be] raised" about her credibility. In addition, although it did not factor much into the court's conclusion, the record indicates that it "stood out" to the court that Collins had not come forward earlier even though she testified that she had known about Cornelio's death for

17

years. At the hearing before Judge Raines, Collins testified that she lived in Texas from approximately 2011 to 2017 and that she knew Cornelio was dead" [p]robably all the time [she] was in Texas," yet she never reached out to Lopez's family members or law enforcement to let them know that Cornelio was the shooter. At the hearing before Judge Walton, Collins's testimony changed; she said she did not find out Cornelio was dead until after she moved back to Chicago in 2017. Ultimately, the court found that the discrepancies in Collins' testimony raised "great concerns about her credibility." Therefore, it concluded that Collins' testimony was not "of such conclusive nature that it would change the results if [Lopez was] retried."

¶ 35 The trial court's ultimate conclusion was not manifestly erroneous. First, although Lopez argues that "the essence of Collins's testimony [was] exactly the same in both hearings," Collins's testimony at the hearings diverged in a critical respect from the statements she made in her signed affidavit. In her affidavit, Collins said "[t]here were three other guys" with Cornelio and she was "positive" none of the three was Lopez because she was "able to see their faces." At the hearing before Judge Raines, however, Collins testified that Cornelio was the only person outside by the car on the night of shooting, and that there was "nobody on foot [and] nobody in the street." When she was confronted with the statement she had previously made, she said that no one was in the street, but she could see the silhouettes of people in a car. Importantly, she said "you couldn't see their face or anything else," contradicting her prior version of events.

¶ 36 Moreover, Collins's credibility was further undermined considering that her testimony—that there was no one else on the street at the time of the shooting—was contradicted by the testimony of every other person on scene that night. At trial, Garcia testified that he saw four individuals outside the car around the time of the shooting, Ruiz testified he saw 5 men "standing around his vehicle," Buchanan testified she saw 2 males get out and start throwing bottles before

she ducked down in the back seat of the car, and Ruelo testified she saw Julio and Marcello get out of her car and start throwing bottles and heard a "bunch of people" running towards the car.

¶ 37     Lopez argues that the case against him was "weak" because there was no physical evidence linking him to the scene of the crime and the case was "dependent upon a single eyewitness." However, in addition to the eyewitness testimony of Ruiz, who provided a physical description matching Lopez shortly after the shooting and then conclusively identified him in a lineup, the jury heard evidence that a second eyewitness—Ruelo—told prosecutors she saw Lopez point a gun inside the driver's side window of the vehicle. Although she recanted at trial after visiting Lopez 15 times in prison, she admitted that she was seated in the front passenger seat of the car parked directly behind Ruiz's vehicle on the night of the shooting. Therefore, she was well positioned to see who the shooter was. Ruelo's prior inconsistent statement identifying Lopez as the shooter was admitted as substantive evidence under 725 ILCS 5/115-10.1 and published to the jury.

¶ 38     In addition to this eyewitness testimony, the jury heard testimony about Lopez's own statements to police, where he admitted he was on scene and at the driver's side of the car on the night of the shooting, punching and physically holding the driver of the car. Although he claimed that a member of a different gang was the shooter, he admitted going to Morales' house after the shooting to call his cousin to pick him up. Although Lopez now denies ever making these statements, he elected not to testify at trial, so the jury did not hear his alternate version of what transpired at the police station.

¶ 39     The jury also heard evidence from Aguirre and Morales, which implicated Lopez as the shooter. Although they both recanted at trial after visiting Lopez a number of times in jail, the statements they gave police shortly after the shooting were admitted into evidence. In those

19

statements, Aguirre and Morales said that Lopez showed up at their home on the night of the shooting, and admitted that he had been chasing a car full of Larazas, fired a handgun into their car, and that some of the individuals in the car were struck by bullets because he saw blood on them.

¶ 40    Evidence recovered from the crime scene, which indicated that the shots were fired from "relatively close range" on the driver's side of the vehicle, was consistent with the testimony of the State's witnesses as well.

¶ 41    Finally, although it did not factor much in the court's conclusion, Collins's credibility was further undermined by her inconsistencies in when she learned of the death of Cornelio, who she claimed was she was afraid of and which was the reason why she did not come forward sooner to disclose what she witnessed on the night in question.

¶ 42    Based on the strength of the evidence against Lopez at trial and the trial court's "great concern" about Collins's credibility because of the inconsistencies in Collins's own statements and the discrepancies between her statements and other eyewitness accounts, we conclude that the new evidence presented by Lopez was not of such conclusive character that it would probably lead to a different result on retrial. Accordingly, we find that the trial court's ultimate decision was not manifestly erroneous.

¶ 43                                III. CONCLUSION

¶ 44    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 45    Affirmed.